PEARSON, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| DWAYNE LACEY, | ) | |
| | ) | CASE NO. 4:11CV02506 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| CITY OF WARREN, *et al.*, | ) | |
| | ) | **MEMORANDUM OF OPINION &** |
| Defendants. | ) | **ORDER** [Resolving ECF No. 31] |

This action originates from an on-the-street encounter between Plaintiff Dwayne Lacey, an African-American bail bondsman, and three Caucasian members of the Warren Police Department. Plaintiff, who was stopped, placed in handcuffs, and searched during the incident, alleges that one of the officers, Defendant Sergeant John Yuricek, violated his civil rights. Plaintiff brings this lawsuit under the auspices of 42 U.S.C. § 1983 against Yuricek and Defendant City of Warren.

The Court is called upon to decide Defendants' motion for summary judgment docketed at ECF No. 31. The Court has reviewed the supporting memorandum of law, the responsive briefs, the submitted exhibits and the governing law. For the reasons explained below, the Court grants Defendants' motion for summary judgment, in part, and denies it, in part.

(4:11CV02506)

# I. __Factual and Procedural Background__

## A. Factual Background

What follows is not in dispute.  Plaintiff is a licensed bail bondsman who works as an independent contractor for All American Big Bob's Bail Bonding, Inc.  ECF No. 37-2 at 6, 51.  A day or two prior to October 21, 2009, Plaintiff was informed by his secretary that Heather Bako, whose bond Plaintiff had written, failed to make a court appearance and that a warrant had been issued for her arrest.  ECF No. 37-2 at 64-66.  Then, on October 21, 2009, Plaintiff received a call from Terry Sartin, the co-signor on Bako's bond.  ECF No. 37-2 at 66, 69.  Sartin asked Plaintiff to travel to his residence in Warren that day to apprehend Bako so that he would not have to pay the forfeiture on the bond.  ECF No. 37-2 at 69-70, 74.  Plaintiff agreed to go.  ECF No. 37-2 at 69.

Plaintiff drove to Sartin's residence in a red Jeep Cherokee.  ECF Nos. 31-1 at 27; 37-2 at 72.  When Plaintiff arrived, he saw Sartin and Bako, who are both Caucasian, standing outside on the sidewalk.  ECF Nos. 37-2 at 74; 31-1 at 26; 37-5 at 18.  Bako immediately fled, and Sartin ran after her.  ECF No. 37-2 at 74-75.  Plaintiff did not pursue Bako.  ECF No. 37-2 at 75.  According to Plaintiff, he generally does not chase anyone whom he cannot convince to go with him voluntarily. ECF No. 37-2 at 84-87.  As Plaintiff prepared to return home, somebody exited Sartin's residence and informed Plaintiff that Sartin had caught Bako one street over on Belvedere Avenue.  ECF No. 37-2 at 75.  Plaintiff drove to that location.  ECF No. 37-2 at 76.  When he arrived, he saw Sartin holding Bako down on the ground.  ECF No. 37-2 at 77.  Bako was yelling, cursing, and trying to escape.  ECF No. 37-2 at 77-78.  Plaintiff approached Bako and placed her in handcuffs.  ECF No. 37-2 at 77.  Plaintiff then escorted Bako to his Jeep and secured her in the front passenger seat of the

2

(4:11CV02506)

vehicle.  ECF No. 37-2 at 82.

As Plaintiff placed his vehicle in motion; ECF Nos. 37-2 at 91; 37-4 at 44; three police vehicles responding to a 911 call from an observer on Belvedere Avenue arrived contemporaneously and surrounded Plaintiff.  ECF Nos. 31-1 at 27; 37-1 at 6, 12; 37-4 at 38.  Patrolman Jeffrey Hoolihan and Yuricek stopped their vehicles in front of Plaintiff's Jeep while Lieutenant Robert Massucci parked his car behind Plaintiff.  ECF Nos. 37-3 at 14; 37-4 at 48; 37-6 at 36.  Plaintiff exited his vehicle.  ECF No. 37-2 at 91.  Hoolihan pointed his gun at Plaintiff and ordered him to put his hands up.  ECF No. 37-6 at 37.  After Plaintiff complied, Hoolihan holstered his weapon and walked to the passenger side of the Jeep to speak with Bako.  ECF Nos. 37-6 at 37-38; 37-2 at 94-95.

The events that allegedly transpired next form the nucleus of this lawsuit.  There is no dispute that Yuricek approached Plaintiff and began speaking to him.  ECF Nos. 37-2 at 97-98; 37-3 at 17; 37-4 at 50.  Plaintiff testified in his deposition that Yuricek asked, "What are you doing on this side of town" and "Why are you picking up white women?"  ECF No. 37-2 at 98.  Plaintiff testified that Yuricek mocked Plaintiff's badge, commenting that Plaintiff "probably bought it at the Army Navy store."  ECF No. 37-2 at 99.  Plaintiff claimed that Yuricek repeatedly and arbitrarily ordered Plaintiff to place his hands on different parts of the Jeep, and that while this occurred Massucci and Hooligan "were standing there smiling, laughing."  ECF No. 37-2 at 99-101.  According to Plaintiff, Yuricek also grabbed his right shoulder and threatened to throw Plaintiff's "black ass" to the ground. ECF No. 37-2 at 103.  Eventually, Yuricek placed Plaintiff in handcuffs.  ECF Nos. 37-2 at 104; 37-4 at 52-53.  Plaintiff testified that he was detained in handcuffs even though his badge was visibly displayed on his belt and Plaintiff had informed Yuricek that he was a bail bondsman.  ECF No. 37-2

(4:11CV02506)

at 98, 108.  Plaintiff testified that the officers "dehumanized" him by handcuffing him, searching his pockets, and taking the collapsible baton and mace from his utility belt.  ECF No. 37-2 at 121-123.

Yuricek's account of the events differs from that of Plaintiff in several respects.  Yuricek testified at his deposition that when he approached Plaintiff, he did not see a badge identifying Plaintiff as a bail bondsman.  ECF No. 37-4 at 51.  While Yuricek acknowledged that Plaintiff claimed to be a bail bondsman, in Yuricek's view, that did not establish who Plaintiff was and what he was doing there.  ECF No. 37-4 at 50, 57.  According to Yuricek, he ordered Plaintiff to keep his hands on the hood of the Jeep because he saw that Plaintiff was carrying weapons in his belt.  ECF No. 37-4 at 51-52.  Yet, despite ordering Plaintiff to keep his hands up at least three times, Plaintiff kept "sliding them off, dropping them down."  ECF No. 37-4 at 52.  For that reason, claimed Yuricek, he decided to handcuff Plaintiff.  ECF No. 37-4 at 52-53.  Yuricek testified that he released Plaintiff from the handcuffs after Massucci spoke with Plaintiff and Massucci seemed "comfortable enough" that Plaintiff was a bail bondsman.  ECF No. 37-4 at 58-59.  Yuricek denied saying that Plaintiff should not pick up white women in that neighborhood.  ECF No. 37-4 at 63.

There is no dispute that Plaintiff was permitted to leave the scene.  ECF Nos. 37-2 at 110; 37-3 at 28; 37-4 at 58-59.  Furthermore, Hoolihan, not Plaintiff, transported Bako to the Mahoning County jail.  ECF No. 37-6 at 40.  It is also undisputed that neither Yuricek nor the other officers investigated Sartin during this incident.  ECF Nos. 37-5 at 18; 37-4 at 62; 37-3 at 27; *see* Dashboard Video Exhibit at ECF No. 33.  Additional facts will be set forth as necessary.

### B. Procedural Posture

Plaintiff filed a Complaint in the Trumbull County, Ohio, Court of Common Pleas, alleging

(4:11CV02506)

that Yuricek violated his Fourth Amendment right to be free from unreasonable search and seizure and the use of excessive force. ECF No. 1-1 at 5-6; *see* ECF No. 35 at 12. Plaintiff also alleges that Yuricek selectively enforced the law on the basis of Plaintiff's race in violation of the Equal Protection Clause of the Fourteenth Amendment. ECF No. 1-1 at 5; *see* ECF No. 35 at 12. Furthermore, Plaintiff asserts a *Monell* claim against the City of Warren on the basis of its alleged failure to provide adequate training, supervision, and discipline for its police officers, which failure constituted a policy of deliberate indifference to the safety of its citizens.[1] ECF No. 1-1 at 6-7. Plaintiff seeks compensatory and punitive damages, costs, and other relief. ECF No. 1-1 at 8.

Defendants removed the action from State court pursuant to this Court's federal question jurisdiction. 28 U.S.C. §§ 1331, 1441(a). After filing an Answer, ECF No. 3, Defendants moved for summary judgment on the grounds that (1) Yuricek did not violate Plaintiff's Fourth or Fourteenth Amendment rights; (2) Yuricek is entitled to qualified immunity; and (3) the facts do not satisfy the elements of a cause of action under *Monell*. ECF No. 31. In support of their motion, Defendants filed a memorandum of law and various exhibits, including a partial video recording taken from the dashboard camera of Hoolihan's patrol car. *See* Dashboard Video Exhibit at ECF No. 33. Plaintiff filed an opposition brief, ECF No. 35, to which Defendants filed a reply. ECF No. 36.

## II. Legal Standard

"Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute

---

[1] Plaintiff's claims with respect to Yuricek are brought against Yuricek in his individual and official capacities. ECF No. 1-1 at 2. As characterized by Plaintiff, the claim against Yuricek in his official capacity is the same as the *Monell* claim against the City of Warren. ECF No. 35 at 21.

(4:11CV02506)

as to any material fact and the movant is entitled to judgment as a matter of law.'" *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (*quoting* Fed. R. Civ. P. 56(a)). "'A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the nonmoving party.'" *U.S. ex rel. Wall v. Circle C Construction, LLC*, 697 F.3d 345, 351 (6th Cir. 2012) (*quoting Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006)). A court deciding a motion for summary judgment "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Kuhn v. Washtenaw County*, 709 F.3d 612, 620 (6th Cir. 2013). "Where the moving party carries its initial burden, the nonmoving party 'may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.'" *Ellington v. City of East Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012) (*quoting Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009)); *see Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) ("a mere 'scintilla' of evidence in support of the nonmoving party's position is insufficient to defeat summary judgment").

## III.  Discussion

This lawsuit is brought under 42 U.S.C. § 1983.[2] Section 1983 creates no substantive rights; rather, it provides remedies for deprivations of rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 817, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985). To prevail under the statute,

---

[2] Section 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

6

(4:11CV02506)

a plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006).  Here, Plaintiff claims that Yuricek, a municipal police officer, violated his Fourth Amendment right to be free from unreasonable searches and seizures and the use of excessive force, as well as his Fourteenth Amendment right to equal protection of the laws. Plaintiff also asserts that the City of Warren caused these constitutional deprivations.

A § 1983 plaintiff must overcome the defense of qualified immunity when it is properly raised, as it was in Defendants' Answer.  *See* ECF No. 3 at 3.  Qualified immunity protects government officials in the performance of their discretionary duties by shielding them from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  The essential purpose of qualified immunity is to provide government officials with the ability to reasonably anticipate when their conduct may give rise to liability and to know that "they will not be held personally liable as long as their actions are reasonable in light of current American law." *Anderson v. Creighton*, 483 U.S. 635, 646, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

The Sixth Circuit has instructed that the qualified immunity standard is one of objective reasonableness and that courts should engage in "'a fact-specific, case-by-case' inquiry focused on 'whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene.'" *Marcilis v. Township of Redford*, 693 F.3d 589, 598 (6th Cir. 2012) (*quoting Cochran v. Gilliam*, 656 F.3d 300, 306 (6th

7

(4:11CV02506)

Cir. 2011)).  In particular, courts should inquire at the summary judgment stage "'(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established.'" *Hearring v. Sliwowski*, 712 F.3d 275, 279 (6th Cir. 2013) (*quoting Bazzi v. City of Dearborn*, 658 F.3d 598, 606-607 (6th Cir. 2011)). "A right is clearly established if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (*quoting Anderson*, 483 U.S. at 640); *see Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009) ("[t]he key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional").  Courts may decide which of the two questions to address first. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

In assessing whether a right is "clearly established," the Court must first look to the decisions of the United States Supreme Court, then to the decisions of the Sixth Circuit, and lastly to the decisions of other circuits. *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006).  While a case "directly on point" is not required, existing precedent must have placed the constitutional question "beyond debate." *Ashcroft v. al-Kidd*, __ U.S. __, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011); *see Smith v. Cupp*, 430 F.3d 766, 776-77 (6th Cir. 2005) ("where a general constitutional rule applies with 'obvious clarity' to a particular case, factually similar decisional law is not required to defeat a claim of qualified immunity").  The issue of qualified immunity may be submitted to a jury only if the legal question of immunity is completely dependent upon which view of the disputed facts is accepted by the jury. *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007).  Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not

8

(4:11CV02506)

entitled to qualified immunity. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6ᵗʰ Cir. 2006).

### A. Fourth Amendment Claims

Plaintiff asserts that the specific acts which constitute a violation of his Fourth Amendment rights are Yuricek's (1) initial handcuffing of Plaintiff; (2) grab and push of Plaintiff's shoulder; (3) search; and (4) "prolonged detention" of Plaintiff. ECF No. 35 at 14-16, 19. Defendants contend that the foregoing acts either did not occur, do not amount to a constitutional violation, or were reasonable under the circumstances. ECF Nos. 31 at 10-17; 36 at 9-16.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches or seizures, shall not be violated . . . ." A person is "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). In the landmark case of *Terry v. Ohio*, the United States Supreme Court enshrined the principle that even when a police officer does not have probable cause to make an arrest, if he or she has reasonable suspicion that criminal activity may be afoot, the officer may conduct a limited seizure and briefly detain an individual for investigative purposes. *Terry v. Ohio*, 392 U.S. 1, 30-31, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *see United States v. Brignon-Ponce*, 422 U.S. 873, 881-82, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975).

A police officer's ability to perform a seizure or investigative detention is cabined to protect individual liberties. "This much . . . is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purposes of the stop. Similarly, the investigative

(4:11CV02506)

methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). In other words, a *Terry* stop cannot be excessively intrusive and "must be reasonably related in scope and duration to the purposes of the investigation." *Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005). The Sixth Circuit follows a two-pronged approach for evaluating whether an investigative stop is reasonable:

> (1) whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion; and (2) whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances. . . . In other words, the greater the degree of intrusion during a stop, the more solid must be the officer's suspicion that the stopped individual is guilty of wrongdoing.

*Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006) (quotations omitted).

Plaintiff concedes that the police had a proper basis to conduct the initial stop because they had information that "a woman was possibly being abducted." ECF No. 35 at 13. Charles Clauss, the Belvedere Avenue observer who placed the 911 call, testified that he told the operator he saw a white male tackle a white female and heard the female cry for help. ECF No. 37-1 at 13-14. After a Jeep Cherokee arrived on the scene, Clauss conveyed that a black male emerged from the vehicle, handcuffed the female, and placed her in his Jeep. ECF No. 37-1 at 17-18. The above information was then communicated to Yuricek and the other officers. ECF No. 37-4 at 43; 31-8 at 3; 31-1 at 26. Accordingly, all responding officers reasonably suspected that they were responding to a criminal abduction. *See Smoak*, 460 F.3d at 778 (reasonable suspicion requires more than hunch

(4:11CV02506)

but "falls considerably short of satisfying a preponderance of the evidence standard" [quotations omitted]); *see also Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (officer's reasonable suspicion "can be derived from such sources as informant tips, dispatch information, and directions from other officers"). The Court's task is to determine whether the events that unfolded after the initial stop constituted an unreasonable degree of intrusion and ripened into constitutional harms.

### 1. Dashboard Camera Video

Preliminarily, the Court will remark about the Dashboard Video Exhibit submitted by Defendants. The Court has reviewed the video carefully. The information it provides is limited. The video ends, without explanation, roughly three minutes after the officers stop Plaintiff. Much of the conversation is inaudible. Furthermore, the initial interaction between Yuricek and Plaintiff occurred off-camera. In fact, the length of time in which Plaintiff actually appears on the video is less than ninety seconds. Despite the obvious limitations of the video as evidence, it offers some important details. The Court will note such details, when appropriate, in the analysis below.

### 2. Initial Handcuffing

The Court begins with the handcuffing of Plaintiff. Fourth Amendment jurisprudence "has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). During a *Terry* stop, officers may use handcuffs so long as circumstances warrant that precaution. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 309 (6th Cir. 2005). In reviewing whether an officer's particular use of force is proper, courts should not judge the reasonableness of the officer's actions "with the benefit of 20/20

11

(4:11CV02506)

hindsight" but should judge it "from the perspective of a reasonable officer on the scene." *Dorsey,* *517 F.3d at 399*. The Fourth Amendment's "reasonableness" inquiry is an objective one. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. . . . An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham,* at 397 (citations omitted). Evaluating the use of force "requires a 'careful balancing' of the individual interest in being free from unreasonable seizures and the important governmental interest in protecting the safety of its peace officers and the public." *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 486 (6th Cir. 2007).

The independent evidence contradicts, to a degree, Plaintiff's account of the events leading up to Yuricek's use of handcuffs. Although Plaintiff testified that six or more minutes elapsed before Yuricek handcuffed him; ECF No. 37-2 at 96; the video shows Plaintiff on the screen, in handcuffs, less than two minutes after the stop. Thus, Plaintiff was placed in handcuffs earlier than he claimed. Although Plaintiff claimed that Yuricek ordered him to arbitrarily place his hands on different parts of his vehicle, Clauss and Bako testified that instead of keeping his hands on the hood of the Jeep as ordered, Plaintiff kept trying to reach into his pockets. ECF Nos. 37-1 at 24; 37-5 at 19. Yuricek is heard in the video ordering Plaintiff to put his hands on the car several times. Moreover, the video does not support Plaintiff's testimony that during the time Yuricek issued orders, Hoolihan and Massucci stood by and laughed. The audio supplied for the dashboard camera was captured from a microphone attached to Hoolihan's uniform. ECF No. 37-6 at 43. Any

(4:11CV02506)

mocking laughter from Hoolihan should have been captured by the video.

The Court finds that qualified immunity attaches to Yuricek's initial use of handcuffs. He was responding to a potentially serious crime, the suspect (Plaintiff) had weapons attached to his utility belt, and Plaintiff did not comply with Yuricek's orders to keep his hands on the car. A reasonable officer on the scene could have believed that the use of handcuffs was justified–at least initially when the situation was tense and many facts were unknown–to secure the suspect and protect the officers, and that it did not impermissibly intrude upon Plaintiff.

### 3. Shoulder Grab and Push

In his opposition brief, Plaintiff claims that Yuricek "grabb[ed] [him] by the shoulder and push[ed] him into the vehicle . . . ." ECF No. 35 at 19. Nothing in the record shows that Yuricek pushed Plaintiff *into* a vehicle. Plaintiff testified that Yuricek grabbed his shoulder for "a couple of seconds" prior to handcuffing him, and that Yuricek "push[ed] with the shoulders." ECF No. 37-2 at 104, 129. Plaintiff did not testify that Yuricek pushed him into a vehicle. Neither Bako nor Clauss, the two witnesses on the scene, saw Yuricek push Plaintiff into a vehicle or physically do anything that appeared improper. ECF Nos. 37-1 at 27; 37-5 at 21. Indeed, at another point in the opposition brief, Plaintiff describes Yuricek's conduct as pushing Plaintiff *toward* the vehicle. ECF No. 35 at 10. The contradictory assertion is not supported by the record.

Yuricek's alleged grab and push of Plaintiff's shoulder does not violate the Fourth Amendment. Plaintiff testified that when Yuricek grabbed his shoulder, Yuricek stated (apparently in regard to Plaintiff's hands), "Well, you didn't put it over here. No, I told you over here." ECF No. 37-2 at 101. Assuming the truth of Plaintiff's testimony, Yuricek evidently grabbed Plaintiff's

13

(4:11CV02506)

shoulder in an attempt to assert control over Plaintiff during the initial moments when Plaintiff was not fully compliant with Yuricek's instructions to keep his hands on the car.  Plaintiff described Yuricek's grab as "not extensive."  ECF No. 37-2 at 135.  Plaintiff did not suffer a bruise or a sprain, and he did not require medical attention for the shoulder.  ECF No. 37-2 at 135-36.  Based on the minimal degree of force used, the point in time in which it was used, and the purpose for which it was applied, the Court concludes that no constitutional injury occurred.  *See McDougald v. Timberlake*, No. 1:08CV744, 2010 WL 2572800 at *4 (S.D. Ohio May 27, 2010) ("in an excessive force claim, a Plaintiff must demonstrate that the amount of force used was sufficiently egregious . . . and that the force used was not *de minimus*").  Moreover, a reasonable officer could have believed that the shoulder grab and push, under the initial circumstances presented, were lawful.  Qualified immunity therefore attaches.[3]

    *4. Search*

    Plaintiff contends that Yuricek searched him.  ECF No. 35 at 14.  Plaintiff divulges little about the search, *e.g.*, when it occurred, what was searched, how long it took.  The only detail

_____

    [3] Plaintiff also argues that Yuricek's "threats and harassment" violated his Fourth Amendment rights.  Presumably, Plaintiff is referring to Yuricek's alleged use of racially charged language and threat to throw Plaintiff's "black ass" to the ground.  ECF No. 37-2 at 102-103.  The officer's alleged use of racial epithets is concerning.  Allegations of an officer's use of verbal threats and racially charged comments do not, however, transform an otherwise nonexcessive use of force into an unconstitutional excessive force, and, thus, do not arise to Fourth Amendment violations.  *See Williams v. Sandel*, 433 Fed. Appx. 353, 362-63 (6th Cir. 2011) ("[p]olicemen's use of slurs and racial epithets is not a search or seizure, and thus cannot sink to the level of violating the Fourth Amendment's prohibition of excessive force" [quotations omitted]), *cert. denied*, __ U.S. __, 132 S. Ct. 1558 (2012); *Marcilis v. Township of Redford*, 693 F.3d 589, 599 (6th Cir. 2012) (threats not excessive force).

(4:11CV02506)

provided by Plaintiff is that it was a "pat down" search.  ECF No. 35 at 16.

The Fourth Amendment protects individuals from unwarranted pat-down searches, or frisks.  "A lawful stop does not necessarily carry with it the authority to conduct a pat-down search."  *Bennett*, 410 F.3d at 822.  To justify a pat-down search, the officer must articulate "specific facts that would warrant 'a reasonably prudent man in the circumstances . . . in the belief that his safety or that of others was in danger.'"  *Id.* (*quoting Terry*, 392 U.S. at 27)).

The evidence discloses that Massucci, not Yuricek, frisked Plaintiff.  In his deposition, Massucci admitted to frisking Plaintiff.  ECF No. 37-3 at 24.  Yuricek denied frisking Plaintiff.  ECF No. 37-4 at 54.  The dashboard video shows Massucci conducting the frisk.  Massucci's frisk is the only search that Plaintiff speaks about in his deposition.  ECF No. 37-2 at 122.

Because Yuricek did not conduct a pat down search of Plaintiff, the Court finds that Yuricek did not violate Plaintiff's constitutional rights by performing an unlawful search.

### 5. Prolonged Detention in Handcuffs

Plaintiff claims that Yuricek detained him in handcuffs for longer than was necessary.  According to Plaintiff, "[a]fter approximately one minute at the scene, the three officers had enough information to reasonably determine that Lacey was not committing a crime."  ECF No. 35 at 14.  Defendants argue that the twelve minutes in which Yuricek and the other officers detained Plaintiff was objectively reasonable because during that time the officers took proper steps to safeguard the area, verify that Plaintiff was a bail bondsman, and verify that Bako had a warrant for her arrest.  ECF 36 at 12.  Defendants also fault Plaintiff for failing to notify the Warren Police Department

15

(4:11CV02506)

pursuant to O.R.C. § 2927.27[4] that he would be in the jurisdiction to apprehend Bako.

The Court reiterates that a "*Terry* stop cannot be excessively intrusive and must be reasonably related in scope and duration to the purposes of the investigation." *Bennett*, 410 F.3d at 836. While the scope of the intrusion permitted in a *Terry* stop will vary with the facts of each case, "the 'detention must be temporary and last no longer than is necessary' and 'the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'" *Id.* at 836 (*quoting Royer*, 460 U.S. at 500).

The Court has determined that the initial stop did not violate the Fourth Amendment, and that Yuricek's initial use of force and handcuffs is protected by qualified immunity. The Court agrees that Yuricek, Hoolihan, and Massucci were entitled to conduct their investigation in a safe environment. In addition, Plaintiff admitted that he did not inform the Warren Police Department of his intention to apprehend Bako. ECF No. 37-2 at 73. Finally, Defendants' assertion that the investigatory detention lasted twelve minutes is supported by the evidence. The department radio log shows that roughly twelve minutes passed between the time the officers arrived on the scene and the time Yuricek and Massucci cleared the job. ECF No. 31-1 at 26.

While twelve minutes is not ordinarily a long time, there is no magic number below which a detention will be reasonable. "[T]here is no bright line rule about the reasonable length of a *Terry* detention." *Crisp v. City of Kenton*, 142 F.3d 432, 1998 WL 180561 at *3 (6th Cir. April 8, 1998).

---

[4] Section 2927.27(A)(3) of the Ohio Revised Code provides that a bail bondsman, "prior to apprehending, detaining, or arresting the principal" must "notif[y] the local law enforcement agency having jurisdiction over the area in which such activities will be performed . . . ."

16

(4:11CV02506)

The reasonableness of any detention must be predicated on the particular facts of the case.  Here, the facts are concerning.  The dashboard video establishes that roughly two minutes into the stop, Hoolihan had already confirmed that there was a "capias" for Bako's arrest and had communicated that information to Yuricek and Massucci.  At that point in time, Plaintiff had told the officers multiple times that he was a bail bondsman. The video also establishes that a metallic object in the shape of a badge was clearly visible on Plaintiff's belt.  When Plaintiff was shown the video during his deposition, he identified that object as his bail bondsman badge.  ECF No. 37-2 at 120. Furthermore, Yuricek and Massucci admitted that Plaintiff did not physically resist the officers or behave aggressively at any time.  ECF Nos. 37-3 at 20; 37-4 at 62.  The video evidence corroborates their testimony.  At no point did Bako, the purported "victim," accuse Plaintiff of abducting her.

The information available to Yuricek and the other officers two minutes into the stop was sufficient to dispel any suspicion that Plaintiff had attempted to abduct Bako, or that he posed any threat.  Yet, Yuricek kept Plaintiff in handcuffs for an additional ten minutes.  A jury is entitled to believe that this amount of time was excessive.  After the officers learned of Bako's outstanding capias, the video shows that Massucci performed a pat down search of Plaintiff and removed the mace and collapsible baton from Plaintiff's belt.  A jury could believe that the search was unwarranted. At that juncture, every indication pointed towards the conclusion that Plaintiff was a bail bondsman on the scene performing his lawful duties.  The only source of the officers' suspicion–the 911 call–had been explained by the facts they had learned on the scene.  Massucci testified that he was not satisfied that Plaintiff was a bail bondsman until he found identification in Plaintiff's wallet.  ECF Nos. 37-3 at 24; 37-2 at 106.  Either he or Yuricek could have asked

17

(4:11CV02506)

Plaintiff to produce the identification at the beginning of the detention.  Instead, Plaintiff was kept in handcuffs and searched.  Viewing all the facts in the light most favorable to Plaintiff, there is a genuine issue as to whether he was detained for an unreasonable period of time, and in an unreasonable manner.

Other facts counsel in favor of the Court's determination.  Bako testified that she informed the officers that Plaintiff was a bail bondsman.  ECF No. 37-5 at 38.  Although Bako's testimony is not corroborated by the video, as previously mentioned, the video ends roughly three minutes into the stop and fails to capture the entire incident.  Furthermore, the waning seconds of the video footage captures the beginning of a conversation between Plaintiff and Yuricek that appears to serve no law enforcement purpose.  In response to Plaintiff's comment, "You got a legal right to do what you do.  I got a legal right to do what I do," Yuricek appears to say, "My legal right's a lot higher than yours."  The question of whether the detention was reasonably related in scope and duration to the purposes of the investigation, therefore, should be decided by a jury.

The Court also concludes that qualified immunity does not attach with respect to the claim of prolonged detention.  Even assuming that a reasonable officer, having learned of Bako's capias, could believe that searching Plaintiff for weapons was proper, no reasonable officer could believe that an additional ten minutes was needed to keep Plaintiff in handcuffs, pat him down, and establish his identity.  The officers could have immediately obtained confirmation of Plaintiff's identity by asking that he produce his bail bondsman identification; yet, this was not done until the end.  Plaintiff's identity could have also been expeditiously established through Bako, who testified that she informed the officers of Plaintiff's identity.  Rather than pursuing their investigation using

18

(4:11CV02506)

the least intrusive means possible, the evidence shows, to the contrary, that Yuricek and the other officers wielded their authority liberally and took their time during the detention.

That Plaintiff did not notify the Warren Police Department of his intention to apprehend Bako does not change the preceding analysis.  It is not lost on the Court that Plaintiff may not have complied with the law and that this incident might have been averted had he provided the appropriate notification.  Nevertheless, Plaintiff's mistake does not require him to forfeit his Fourth Amendment rights.

The cases cited by Defendants do not support their claims that Yuricek's actions were lawful.  Rather, the cases are factually distinguishable.  In *Radvansky*, 395 F.3d at 309, the Sixth Circuit held that police officers were justified in using handcuffs to detain a tenant who was attempting to break into his residence after having been locked out by his landlord.  In that case, however, the police had received a call at night about a burglary in progress, had observed a broken window and screen on the premises, had been informed by the homeowner that the suspect was most likely not privileged to be there, and the suspect had told the police that he was armed with stun gun.  *Id.*  Moreover, the issue in *Radvansky* was not the length of the investigatory detention. In *Crisp*, 1998 WL 180561 at *1-*2, the Sixth Circuit held that police officers were justified in detaining the plaintiff and three friends in handcuffs for "no more than 15 minutes" after responding to a 911 call from an observer who reported seeing the men remove items from a residence.  Later, it was established that the residence belonged to the plaintiff's father, that the plaintiff had permission to be there, and that he possessed identification indicating the residence as his address. The plaintiff alleged that his Fourth Amendment rights had been violated because the officers

(4:11CV02506)

continued to detain him even though they knew or should have known that he had permission to be on the premises, and even though they should have believed his protestations of innocence and immediately checked his identification.  Yet, in *Crisp*, the plaintiff's own expert testified that it was proper procedure in such a case to delay review of a suspect's identification after a search of a dwelling's perimeter, and that it was possible for one family member to burglarize the premises of another family member.  Here, unlike in *Crisp*, there was no perimeter to be searched, Plaintiff was the only suspect on whom the officers focused[5], and the facts immediately known to the officers established a far stronger basis for innocence than the facts known by the officers in *Crisp*.

For the above reasons, Plaintiff's prolonged detention claim shall be proceed to trial.[6]

---

[5]  The video shows Sartin, the individual who tackled Bako standing nearby in the initial moments of the stop.  That footage and the record reveal that the police showed no interest in Sartin, as discussed below.

[6]  For the same reasons, the Court concludes that there is a genuine issue in regard to whether the investigatory detention evolved into an arrest without probable cause.  *See Dorsey*, 517 F.3d at 398-99 ("When the nature of a seizure exceeds the bounds of a permissible investigative stop, the detention may become an arrest that must be supported by probable cause. . . . We consider such factors as the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigative stop is reasonably related to the basis for the original intrusion." [citation omitted]); *Smoak*, 460 F.3d at 780-81 ("When police actions go beyond checking out the suspicious circumstances that led to the original [*Terry*] stop, the detention becomes an arrest that must be supported by probable cause."); *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir. 1986) ("resolving the question of whether a seizure is an investigative stop, rather than an arrest, generally depends on the reasonableness of the stop under the circumstances"), *cert. denied*, 497 U.S. 1097, 107 S. Ct. 1318, 94 L. Ed. 2d 171 (1987).

(4:11CV02506)

### B.  Fourteenth Amendment Claim

Plaintiff testified in his deposition that when Yuricek first approached him, Yuricek asked, "What are you doing on this side of town" and "Why are you picking up white women?"  ECF No. 37-2 at 98.  Plaintiff testified that prior to handcuffing him, Yuricek threatened to throw his "black ass" on the ground.  ECF No. 37-2 at 102-103.  Bako testified that the officers "used the 'N' word several amounts of times" but did not identify which officer or officers as the speaker.  ECF No. 37-5 at 16.  As noted above, there is no dispute that the officers did not attempt to question or stop Sartin, the Caucasian male who tackled Bako and was still on the scene when the police arrived.  Because of the foregoing, Plaintiff claims that Yuricek selectively enforced the law on the basis of Plaintiff's race.  ECF No. 35 at 20.

The Sixth Circuit follows a three-part test for determining whether selective enforcement of the law in violation of the Equal Protection Clause has occurred:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has not decided to prosecute persons not belonging to that group in similar situations.  Second, [the official] must initiate the prosecution with a discriminatory purpose.  Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000) (*quoting United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991).  With regard to the first element, Plaintiff must make a *prima facie* showing that similarly situated persons outside his category were not prosecuted.  *Id*.  "In determining whether individuals are similarly situated, a court should not demand exact correlation, but should instead seek relevant similarity."  *Bench Billboard v. City of Cincinnati*, 675 F.3d 974,

(4:11CV02506)

987 (6th Cir. 2012) (quotations omitted).  "[D]isparate treatment of persons is reasonably justified

if they are dissimilar in some material respect."  *TriHealth, Inc. v. Board of Commissioners*, 430

F.3d 783, 790 (6th Cir. 2005).

Yuricek testified that, prior to arriving on the scene, the dispatcher informed him that "a

while male, tackled a white female . . . who in turn handed the white female over to a black male."

ECF No. 37-4 at 43.  Thus, Yuricek knew that a white male was involved in the possible crime for

which he was responding.  Furthermore, the Hoolihan's dashboard video shows that when the

officers arrived on the scene, Sartin was standing nearby–approximately one house away from

Plaintiff's Jeep on Belvedere Avenue.

Notwithstanding the above, the Court concludes that Plaintiff and Sartin were not similarly

situated individuals.  When the police arrived, it was Plaintiff, not Sartin, who had custody of Bako

in a vehicle.  Moreover, Plaintiff was driving the vehicle when the officers stopped him.  Finally,

Plaintiff was visibly armed.  At that juncture, Yuricek had reason to believe that Plaintiff was an

immediate threat to Bako–a threat that Sartin did not represent.  Thus, Yuricek properly focused his

attention solely on Plaintiff.  Moreover, the dashboard video shows that while Yuricek was ordering

Plaintiff to place his hands on his Jeep, Sartin walked away from the scene.

Therefore, the evidence establishes that Plaintiff and Sartin were not similarly situated for

the purposes of the detention, even though Yuricek knew that both men might have committed a

crime.  Yuricek was presented with a choice of approaching one man *as opposed to* the other, and

he reasonably chose Plaintiff.  While Yuricek might have attempted to prevent Sartin from leaving

the scene, that would have required Yuricek to abandon, or at least divert, his efforts to secure and

22

(4:11CV02506)

restrain Plaintiff, possibly to the detriment of the officers' safety. Furthermore, Yuricek was not the supervising officer on the scene–Massucci was. At no point did Massucci instruct Yuricek to pursue Sartin. Finally, Yuricek had no reason to locate and pursue Sartin after the detention of Plaintiff was over. By that time, it had been established that Bako was not a victim of an abduction.

While Plaintiff's testimony regarding the racist language is concerning and is evidence of a discriminatory motive, Plaintiff cannot show that he and Sartin were similarly situated individuals, which must be demonstrated in a selective enforcement claim. Moreover, Yuricek is entitled to qualified immunity, because a reasonable officer could believe no selective enforcement had occurred because it was appropriate at the time to detain Plaintiff instead of Sartin.

### C. *Monell* Claim

Plaintiff claims that genuine issues exist as to whether the City of Warren (hereafter "the City") caused the constitutional harms alleged by being "deliberately indifferent" to the inadequate training, supervision, and discipline of its police officers. ECF No. 35 at 22. Defendants assert that its training and disciplinary programs are adequate. ECF No. 31 at 22. Defendants proffer the police department's Policy and Procedure Handbook in effect at the time of the incident. S*ee* 31-1. Defendants also present the affidavit of Eric Merkel, who manages the in-service training program for the Warren Police Department. ECF No. 31-1 at 1. He testifies that from 2005 to 2009, Warren police officers received thirty-five to forty hours of in-service training each year, conducted by stated certified instructors and attorneys, regarding the use of force and impartial policing relating to search and seizures. Finally, Defendants assert that they are entitled to summary judgement because Plaintiff simply has presented no evidence that the City acted with deliberate indifference

23

(4:11CV02506)

with respect to the training, supervision, or discipline of its police officers.  ECF No. 31 at 22.

In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), the Supreme Court announced that municipalities may be held liable under § 1983 if the injury was caused by a "policy" or "custom" of the municipality.  The reason for restricting municipal liability to injuries caused by City policy or custom was the Supreme Court's determination in the same opinion that Congress did not intend for § 1983 to impose *respondeat superior* liability upon municipalities for injuries inflicted solely by its employees or agents.  *Id.* at 695.  Therefore, "[t]hat a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably."  *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 406-407, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) (emphasis in original).  Rather, there must have been "deliberate conduct" on the part of the municipality.  *Id.* at 404.

After *Monell*, in *City of Canton v. Harris*, 489 U.S. 378, 388-89, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989), the Supreme Court held that the existence of an inadequate police training program may fairly be said to represent a municipal policy or custom of inadequate training, and thus actionable under § 1983, when the failure to train "evidences a 'deliberate indifference' to the rights of its inhabitants . . . ."  The *Canton* Court identified two representative scenarios.  First, when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Id.* at 390.  Second, when "the police, in exercising

24

(4:11CV02506)

their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers," a finding of deliberate indifference is appropriate. *Id.* at 390 n.10.  In other words, "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. at 410.

Finally, "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. at 404.  Therefore, in summary, "[i]n order to establish a failure-to-train claim, [a plaintiff] must establish that: 1) the City's training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the [C]ity's deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006).  Claims of inadequate police supervisory or disciplinary programs are evaluated under the same standard as a failure-to-train claim.  *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005), *cert. denied*, 546 U.S. 814, 126 S. Ct. 338, 163 L. Ed. 2d 50 (2005); *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994), *cert. denied*, 513 U.S. 1111, 115 S. Ct. 902, 130 L. Ed. 2d 786 (1995).

In order to survive summary judgment, Plaintiff must minimally present evidence showing that departmental programs with respect to the training, supervision, and discipline of police officers are inadequate.  In support of this requirement, Plaintiff presents the following evidence: (1) an investigation conducted by the Department of Justice ("DOJ") between 2004 and 2006

25

(4:11CV02506)

regarding "an alleged pattern or practice of excessive force and illegal searches" throughout the Warren Police Department; (2) Yuricek and Massucci's lack of knowledge regarding the contents of a Settlement Agreement reached between the DOJ and the City in 2012, in which the City agreed to implement certain policy changes and additional training; and (3) the affidavit of Plaintiff's witness, Michael D'Amico, who testifies as to his belief that the "patterns of behavior in existence prior to the 2004-2006 investigation may still be occurring by certain Warren Police Department officers."  ECF Nos. 35 at 22-23; 35-9 at 2.

The foregoing evidence fails to create a genuine issue with respect to the adequacy of the City's police training, supervision, and discipline programs.  First, Plaintiff fails to present evidence of what the 2004-2006 DOJ investigation found.  Although Plaintiff proffers the 2012 Settlement Agreement in which the City agreed to make certain departmental changes, the City expressly denied the allegations lodged by the DOJ.  *See* ECF No. 4 at 3 in Case No. 4:12CV00086.  Also, Yuricek and Massucci's lack of knowledge regarding the contents of the 2012 Settlement Agreement does not mean, as Plaintiff claims, that departmental changes were not implemented as planned.  Third, D'Amico's affidavit testimony fails to offer insight, supported by facts, with respect to the state of departmental programs during the relevant time period.  Finally, even if the evidence presented by Plaintiff created a genuine issue of material fact that the police programs were inadequate, Plaintiff has not introduced evidence of deliberate indifference on the part of the City, or that the deliberate indifference was the cause of the injury.

Defendants have shown, therefore, that Plaintiff cannot prevail on a *Monell* claim.  The burden of the party moving for summary judgment "may be discharged by 'showing' – that is,

(4:11CV02506)

pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  This claim cannot proceed to trial.

### IV. <u>Conclusion</u>

Based on the above, the Court grants the motion for summary judgment, in part, and denies it, in part.  The only claim that survives is Plaintiff's claim of prolonged detention.

The matter is scheduled for trial on January 13, 2014.  A final pretrial will be held on December 11, 2013 at 9 a.m.


IT IS SO ORDERED.


 September 30, 2013                                        */s/ Benita Y. Pearson*
Date                                                              Benita Y. Pearson
                                                                    United States District Judge

27